**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:25-cv-04403-RDM |
| v. | |
| MONICA H. EVANS, *et al.*, | |
| Defendants. | |

**UNITED STATES' CONSOLIDATED MEMORANDUM
IN OPPOSITION TO MOTIONS TO DISMISS (Dkts. 40, 41, 43) AND
REPLY IN SUPPORT OF ITS MOTION TO COMPEL (Dkt. 4-2)**

**TABE OF CONTENTS**

I.     INTRODUCTION ................................................................................................................ 1

II.    BACKGROUND ................................................................................................................. 4

III.   MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE DEMAND'S BASIS AND PURPOSE. .................................................... 6

    A.     The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA. ........................................................................................................ 6

    B.     Defendants cannot challenge the Attorney General's basis and purpose to investigate the District of Columbia's HAVA and NVRA compliance. ...................................................... 12

    C.     Enforcement of HAVA and the NVRA ensure that eligible voters remain on the rolls and safeguard the right to vote........................................................................................... 16

    D.     The District of Columbia's VRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election. .................................. 18

IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS ........................... 24

    A.     The United States is complying with the Privacy Act. ............................................... 25

    B.     The First Amendment does not prohibit the United States' access to data maintained under HAVA or the NVRA. .......................................................................................................... 27

    C.     The E-Government Act does not prevent the United States from obtaining data maintained under HAVA or the NVRA.................................................................................................. 27

    D.     The District of Columbia's Privacy Laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA............................................................................ 29

V.     CONCLUSION................................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) .......................................... 7, 12, 19, 32

*Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..................................................... 4, 30

*Becker v. United States*, 451 U.S. 1306 (1981) ...............................................................................11, 12

*Becker v. United States*, 452 U.S. 912 (1981) .......................................................................................11

*Becker v. United States*, 452 U.S. 935 (1981) .......................................................................................11

*Bush v. Gore*, 531 U.S. 98 (2000) ........................................................................................................ 18

*Coal. for Open Democracy v. Scanlan*,
   No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025).................................................. 32

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).............................................................................. 7, 14

*Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87 (2017) ............................................................ 19

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).............................................................................. 15

*Donaldson v. United States*, 400 U.S. 517 (1971) ..............................................................................11, 21

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018)..................................................................................... 12

*Ex Parte Siebold*, 100 U.S. 371 (1879).............................................................................................. 30

*Formella v. Coal. for Open Democracy*,
   No. 25-1585, 2025 WL 3786144, No. 25-1585 (1st Cir. July 2, 2025)................................................. 32

*Foster v. Love*, 522 U.S. 67 (1997)..................................................................................................... 30

*Heckler v. Chaney*, 470 U.S. 821 (1985) ............................................................................................ 15

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ........................................................................... 13, 14

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963)............................................................................... 9

*Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019).................................................................. 21

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ................................................................................. *passim*

*King v. Burwell*, 576 U.S. 473 (2015).................................................................................................. 15

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985)......................................................................... 3, 21

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011)....................................................................................... 18

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ................................................................... 18

*N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) .............................................................. 21

*Project Vote v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016)................................................................ 21

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) ................................................... 22

*Purcell v. Gonzalez*, 549 U.S. 1 (2006)................................................................................................ 17

*Reynolds v. Sims*, 377 U.S. 533 (1964).............................................................................................. 17, 18

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ...................................................................... 18

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)........................................................................ 30

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960)............................ 7, 8

*United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026),
   *appeal filed*, No. 26-1225 (6th Cir. Feb. 25, 2026) ......................................................................... *passim*

*United States v. Clarke*, 573 U.S. 248 (2014)....................................................................................... 21

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995) ...................................................................... 9

*United States v. Mississippi*, 380 U.S. 128 (1965)..................................................................... 21

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)..................................................... 7, 10, 14

*United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) *appeal filed*, No. 26-1231 (9th Cir. Feb. 25, 2026)........................................................................... 9, 10

*United States v. Powell*, 379 U.S. 48 (1964)................................................................... 7, 9, 10, 14

*United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal filed*, No. 26-1232 (9th Cir. Feb. 25, 2026)......................................................9, 11

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1............................................................................................................ 4

## Statutes

5 U.S.C. § 552a(e)(7) ................................................................................................................... 27

8 U.S.C. § 1445(f) ........................................................................................................................ 23

8 U.S.C. § 1449 ............................................................................................................................ 23

10 U.S.C. § 130c(d)(2)(C) ........................................................................................................... 23

13 U.S.C. § 214 ............................................................................................................................ 23

26 U.S.C. § 7605(b) ..................................................................................................................... 10

30 U.S.C. § 1732(b) ..................................................................................................................... 23

44 U.S.C. § 3572(f) ...................................................................................................................... 23

52 U.S.C. § 20507 ............................................................................................................... 5, 12, 30

52 U.S.C. § 20701 ................................................................................................................. *passim*

52 U.S.C. § 20703 ................................................................................................................. *passim*

52 U.S.C. § 20704 ........................................................................................................................ 30

52 U.S.C. § 20705 .......................................................................................................................... 1

52 U.S.C. § 21083 ................................................................................................................. *passim*

Pub. L. No. 107–347, § 208 ....................................................................................................28-29

## Other Authorities

*Black's Law Dictionary* 1158 (5th ed. 1979) .............................................................................. 18

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process (Aug. 2021) ................................................................................................................... 16, 17

H.R. Rep. 107-329, pt. 1 (2001) .................................................................................................. 17

U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008),........ 3

*United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006) ....................................... 3

*United States v. Indiana*, No. 1:06-cv-1000 (D. Ind. June 27, 2006) ........................................... 3

*United States v. New Jersey*, No. 06-cv-4889 (D. N.J. Oct. 12, 2006) ......................................... 3

*United States v. Maine*, 2007 WL 1059565 (D. Me. Apr. 4, 2007).............................................. 3

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960).................................. 22

*Webster's Third New International Dictionary* (1966 ed. unabridg.) ........................................... 22

**Regulations**

28 C.F.R. § 0.50 ................................................................................................................. 27
28 C.F.R. § 0.51 ................................................................................................................. 27
68 Fed. Reg. 47610-01 (Aug. 11, 2003) ........................................................................... 26
70 Fed. Reg. 43904-01 (July 29, 2005) ............................................................................ 26
82 Fed. Reg. 24147-01 (May 25, 2017) ............................................................................ 26
D.C. Code § 2-534(c) ......................................................................................................... 29

**Rules**

Fed. R. Civ. P. 81 ................................................................................................................ 8

Plaintiff United States of America respectfully submits this consolidated Memorandum of Law: (1) in Opposition to the Motions to Dismiss by Executive Director Monica H. Evans, Chairman Gary Thompson, and Member Karyn Greenfield of the District of Columbia Board of Elections (Dkt. 41) (collectively, "the Board"); Intervenor-Defendants Common Cause, Ruth Goldman, and Chris Melody Fields (Dkt. 40); and Intervenor-Defendant Maryland/DC Alliance for Retired Americans (Dkt. 43); and (2) in Reply in Support of the United States' Motion to Compel (Dkt. 4-2). Collectively, the Board and the Intervenor-Defendants are referred to as "Defendants."

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of the investigation of the District of Columbia's list maintenance practices under the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). The United States sent a demand letter to the Board in accordance with Title III of the Civil Rights Act of 1960 ("CRA"), requesting the Board's cooperation in providing federal election records necessary to assess HAVA and NVRA requirements. The Board refused to produce those records. This action followed. Dkt. 5-1, Compl., ¶¶ 23, 28, 29.

Title III of the CRA provides the principal statutory authority for the United States to immediately obtain federal election records including the District of Columbia's district wide Voter Registration List ("VRL").  Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of an officer of election relating to registration or other acts requisite to voting in federal elections.  52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA).  In that

1

manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1]

The Board argues that the Department of Justice is amassing a nationwide voter database. *See* Dkt. 41-1 at 26–27. It is not. The Civil Rights Division's sole purpose in requesting the District of Columbia's VRL is to assess the District's compliance with the voting laws that the Civil Rights Division enforces. Second Declaration of Eric Neff (2d Neff Decl.) ¶¶ 2–5. When the Civil Rights Division performs this individualized assessment, the jurisdiction's VRL is compartmentalized and maintained by the Civil Rights Division separately from the VRL of any other jurisdiction. *Id.*, ¶ 6. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. *Id*. The fact that the Civil Rights Division also is assessing whether other jurisdictions are complying with the list maintenance provisions is not relevant to the election records the United States seeks from the District of Columbia.

The Board also has argued that the CRA has never been used for the purpose of obtaining voter lists to enforce the list maintenance provisions of HAVA and the NVRA. *See* Dkt. 41-1 at 26. This is also incorrect. The United States has used the CRA to obtain statewide voter lists to

---

[1] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently, two district courts in the Ninth Circuit and one district court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by misapplications of the statute. *See infra* at 9–12.

assess list maintenance in Georgia and Texas.[2] Similarly, in 2007, the United States entered into a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, 2007 WL 1059565 (D. Me. Apr. 4, 2007). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." (emphasis added).[3] The United States entered similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance.[4] The extent of the litigation necessary to obtain those records in 2026 simply reflects a coordinated effort to impede federal enforcement of HAVA and the NVRA.

Therefore, the United States respectfully submits that the Court should grant its Motion to Compel (Dkt. 4-2), deny the Motions to Dismiss (Dkts. 41, 40, 43) and enter an order compelling production of the District of Columbia's VRL and other responsive federal election records.

---

[2] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. 1. The Court entered a consent decree in the Georgia case requiring production of the VRL. *See Georgia, supra*, at Dkt. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited April 3, 2026). For the Court's convenience, the documents are provided herein as 2d Neff Decl., Exs. 8–10.

[3] Paragraph 11 of the Consent decree explicitly invokes the CRA at 42 U.S.C. § 1974 (recodified at 52 U.S.C. § 20701). 2d Neff Decl., Ex. 11. *See also McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (42 U.S.C. § 1974 requires preservation of election records).

[4] *See* 2d Neff Decl., Ex. 12, *United States v. New Jersey*, No. 06-cv-4889 (D. N.J. Oct. 12, 2006), Dkt. 2. In New Jersey, paragraph five of the stipulated order required the HAVA identifiers to be provided and required Defendants to retain voter registration and list maintenance records. *Id. See also id.*, Ex. 13, *United States v. Indiana*, No. 1:06-cv-1000 (D. Ind. June 27, 2006), Dkt. 4. In Indiana, paragraph eight of the Consent Decree required the State of Indiana to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided by… [Section 20701]." *Id.*

## II.    BACKGROUND

While the United States Constitution invests States with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those State choices. The Elections Clause provides that, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; *but* the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1 (emphasis added). The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7–9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized VRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of

4

eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*  Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA.  *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA).  The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections.  *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes, on July 11, 2025, the United States wrote to the Board, the entity charged with administering elections in the District of Columbia, regarding the District of Columbia's compliance with federal election law and requesting a copy of the full VRL. Dkt. 2-3 at 1. The Board responded to the United States' request with a letter containing selective and incomplete data and refusing to provide the full VRL as requested. Dkt. 2-4.

On August 14, 2025, the United States sent a letter renewing the July 11 request with a demand for a copy of the District of Columbia's district wide VRL. Dkt. 2-5. The United States indicated that it was making a demand under the CRA for the federal election records to be produced. Dkt. 2-5 at 2. The demand required an electronic copy of the full VRL including either the driver's license number, the SSN4, or both, as provided by HAVA. *Id.*  It further informed the Board that the District of Columbia's VRL could be produced through the Department of Justice's secure file-sharing system. *Id*. at 3 . On September 4, 2025, the Board declined to produce the election records, arguing that local privacy laws barred disclosure. Dkt. 2-6 at 2. The Attorney General instituted summary proceedings to compel production. *See* Compl., Dkt. 4-2 and 5-1.

5

The United States seeks these documents to evaluate the District of Columbia's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action. *See* 2d Neff Decl. ¶ 2. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶ 4.

### III. MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE DEMAND'S BASIS AND PURPOSE.

Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand by reference to cases interpreting a different statute and incorrectly asserting it has "the same language" as the CRA. Dkt. 41-1 at 11. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Defendants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, the Motions to Dismiss (Dkts. 41, 40, 43) should be denied and the United States' Motion to Compel (Dkt. 4-2) should be granted.

#### A. The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.

Defendants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Dkt. 41-1 at 9-13; Dkt. 40-1 at 10-15. They repeat what the Fifth Circuit has described as "a basic

misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is… purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Defendants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped him with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[5] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have withheld. *See id.* at 227 (the Attorney General's "right to records does not require that he show he could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is

---

[5] The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

"a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id*. In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225–26; *see also Gallion*, 187 F. Supp. at 852 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

The Board asserts that the United States claims the CRA allows it "access to whatever documents it asks for, at any time, and over any objections, no matter how well-founded." Dkt. 41-1 at 10. That is incorrect. The United States' position is that the CRA allows it access to "voter registration lists and other federal election records demanded by the Attorney General." Dkt. 4-2, Motion to Compel, at 13. Specifically, the "records and papers" required to be retained for 22 months by 52 U.S.C. § 20701 and demanded pursuant to the Attorney General's authority under 52 U.S.C. § 20703.

A recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Defendants. *See United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *7 (W.D. Mich. Feb. 10, 2026), *appeal filed*, No. 26-1225 (6th Cir. Feb. 25, 2026). Instead, the *Benson* court construed "a request for records under the CRA as

8

a form of administrative subpoena." *Id.* (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826–27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…." *Benson*, 2026 WL 362789, at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). The court acknowledged that "a district court's role in the enforcement of an administrative subpoena is a limited one." *Benson*, 2026 WL 362789, at *7 (quoting *Markwood*, 48 F.3d at 976).

Two district courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *7–8 (D. Or. Feb. 5, 2026), *appeal filed*, No. 26-1231 (9th Cir. Feb. 25, 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *8 & n.15 (C.D. Cal. Jan. 15, 2026), *appeal filed*, No. 26-1232 (9th Cir. Feb. 25, 2026) .[6] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…[.]" *Powell,* 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying

---

[6] Defendants cite extensively to *Weber* throughout their briefs. *See* Dkts. 41-1, 40-1 and 43-3, *passim*. As discussed below, *Benson* addressed many of the legal errors in *Weber* that call into question whether *Weber* merits any consideration.

reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402, at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). Although accurately quoting language from *Powell*, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id*. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52–53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for election officers to object to Title III proceedings being initiated against them. *See id.* Nevertheless, the Board asserts the CRA and IRC have "the same language" and omits the operative language in the IRC that was determinative in *Powell* throughout their brief. Dkt. 41-1 at 11.

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even just because it wants assurance that it is not*." *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642–43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the

statutory limitations that Congress included in the IRC.[7]

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court. *See Weber*, 2026 WL 118807, at *8 (citing *Becker v. United States*, 451 U.S. 1306 (1981)). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available." *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528–29 (1971)). Justice Rehnquist distinguished between agency efforts "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the

---

[7] The *Oregon* decision similarly misread *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1. *Lynd* does not say filing a pleading waives the CRA's expedited process. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

former context (seizing income-producing property). *Id*. at 1308, 1310–11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting Defendants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225–26; *see also Gallion*, 187 F. Supp. at 852 (same).

**B. Defendants cannot challenge the Attorney General's basis and purpose to investigate the District of Columbia's HAVA and NVRA compliance.**

The Board argues also that the CRA does not authorize the United States to access the District of Columbia's unredacted VRL to assess its compliance with the NVRA and HAVA because the United States "would not be entitled to such a record" under the latter statutes. Dkt. 41-1 at 18. This is wrong, first because the NVRA expressly applies "in addition to all other rights and remedies provided by law," 52 U.S.C. § 20510(d)(1), and more importantly because the CRA, NVRA and HAVA operate in harmony, not in conflict. It is the Court's "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018).

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that. On August 14, 2025, the United States sent the Board a written demand for a copy of the District of Columbia's VRL. *See* Dkt. 2-5. As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA

12

and HAVA, and the purpose was to "assess [the District of Columbia]'s compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA")." Dkt. 2-5 at 1.

Nevertheless, Defendants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Dkt. 41-1 at 16-17; Dkt. 40-1 at 16-19; Dkt. 43-3 at 7–14.[8] As a threshold matter, the CRA does not allow these criticisms to derail the United States' demand for election records.

Defendants cannot use any "procedural device or maneuver," including the Defendants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…." *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, WL 362789, at *8 (W.D. Mich. Feb. 10, 2026) ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *See In re Coleman*, 208 F. Supp. 199, 200-01 (S.D. Miss. 1962) (*Coleman* I).

---

[8] Common Cause-Intervenors accuse the United States of attempting to disenfranchise voters. Dkt. 40-1 at 7-10. Indeed, they go even further, repeating unsubstantiated and erroneous news reports claiming that the goal of the United States is "unlawfully and improperly mass-challenging voters and interfering with the states' democratic process." *Id*. at 9. At bottom, the alarmist contentions made by Intervenors reflect their disagreement with investigation and enforcement of the list maintenance requirements in HAVA and the NVRA that were enacted by Congress on a bipartisan basis. As explained above, those requirements help protect, not hinder, individual voting rights.

In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). The motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts.

Federal courts have rejected contentions that parallel those made by Defendants. Defendants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law fails for the reasons discussed above. *See supra*, Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely HAVA and the NVRA, suffices.

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for his demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642–43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating that the purpose of the request was to "ascertain [the District of Columbia]'s compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA")."

14

Dkt. 2-5 at 1. [9]

Even if the court allows the type of inquiry Defendants seek—and it should not—the United States can demonstrate its factual basis. HAVA requires that voter registration applicants provide a driver's license and SSN4 if they have one. *See* 52 U.S.C. § 21083(a)(5)(A)(i). The United States needs to verify that states are collecting these numbers by looking at an unredacted voter list. *See* 2d Neff Decl. ¶ 5.

The United States made this demand in the August 14 Letter:

> [T]he electronic copy of the statewide Voter Registration List ("VRL") must contain all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA") to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

August 14 Letter (Dkt. 2-5 at 1). The accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that DOJ be able to conduct an independent review of each state's list…." *Id.* at n.1. These numbers are also necessary to fulfill the purpose of assessing whether a jurisdiction is complying with list maintenance requirements because the HAVA identifiers are used to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶¶ 4–5.

---

[9] Defendants are incorrect when they assert that Congress required a demand's "basis" to be distinct from its "purpose." Section 303's use of the terms "basis" and "purpose" reflects nothing more than "a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)." *King v. Burwell*, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting). That is, Section 303's use of the term "the basis and the purpose therefor" is best understood to require the Attorney General or his designee to tell a State what he is looking for and a high-level explanation as to why. As a result, as in other legal contexts, the same explanation can furnish both an action's "conceptual basis and purpose." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533 (1984); *see also, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 841 (1985) (Marshall, J., concurring in the judgment).

Even if more of an explanation were required, the July 11, 2025 demand provided additional context, explaining that data from the Election Assistance Commission showed the District of Columbia having two and a half times the national average of inactive voter registrations as a percentage of registrations, and an unusually high registration rate of the citizen voting age population. *See* Dkt. 2-3 at 2. The United States' July 11 and August 14, 2025, letters "collectively put [the District of Columbia] on notice of the basis and purpose of its request, which is sufficient to comply with the CRA." *See, e.g., Benson*, 2026 WL 362789 at *8 n.3 (W.D. Mich. Feb. 10, 2026).

## C. Enforcement of HAVA and the NVRA ensure that eligible voters remain on the rolls and safeguard the right to vote.

The Board suggests that enforcing list maintenance by examining compliance with HAVA's identification requirements is unrelated to "safeguarding the right to vote" and is unrelated to any "disenfranchisement concerns." Dkt. 41-1 at 2-3, 26. The Board is mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 31–32 (Aug. 2021) (excerpts provided as 2d Neff Decl., Ex. 14). Furthermore, the Commission noted that it

was "estimated that 92% of all registered voters also have a driver's license," *id.* at 29, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id*. It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33.

Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[10] H.R. Rep. 107-329, pt. 1, at 36 (2001). Although often downplayed in public discourse, courts have repeatedly recognized that "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).[11] HAVA addresses the process of voting brought to light nationally by the 2000 federal election and the Supreme

---

[10] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 8-10. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached to 2d Neff Decl., Ex. 6). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex. 7).

[11] *See also, e.g., Burson v. Freeman*, 504 U.S. 191, 199 (1992); *Anderson v. United States*, 417 U.S. 211, 226 (1974); *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000),[12] as the 14th Amendment Equal Protection Guarantee applies to *how* votes are counted, not just who can vote. *Id.* (citing *Sims,* 377 U.S. at 554–55 (1964)).

### D. The District of Columbia's VRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added).

The District of Columbia's VRL is perhaps the archetypical example of a "record" that "relat[es] to" voter "registration." 52 U.S.C. § 20701. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 566 (2012). And "[t]he ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 567 n.1 (2011) (the term "related" is "expansive"). The VRL is the method by which the District records who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute

---

[12] *See* United States Elections Commission: "Help America Vote Act" available at https://www.eac.gov/about/help_america_vote_act.aspx (last viewed April 3, 2026).

enumerates." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registrations," 52 U.S.C. § 20701.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute.  It does not exclude any voting record that the Board maintains, despite the Board's argument that the VRL is excluded because the Board "created" it. *See* Dkt. 41-1 at 19–20.  One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).  In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress."  306 F.2d at 226.  This requirement "is sweeping."  *Id*.  It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Defendants suggest.

Federal courts have concluded that Section 303 requires reproduction and copying.  For example, in *Lynd*, the court rejected a "mechanical objection[]" in which copying federal election records "would, at one time, have been a formidable thing."  *Lynd*, 306 F.2d at 231.  There, the court observed that "[m]odern photostating equipment will make short order of most of these demands."  *Id.*  The District of Columbia's VRL is required by HAVA to be in electronic form. 52 U.S.C. § 21083(a)(1)(A).  It is axiomatic that providing the United States with an electronic copy of its VRL will be much less burdensome than physical copying of every individual registration record if complete physical records even exist outside of their electronic form.

19

The Board cites *Benson* for the proposition that the Board does not come into possession of the VRL. Dkt. 41-1 at 20. The *Benson* court read Section 301 much more narrowly and denied production of a VRL for a narrower reason: that it applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." *Benson*, 2026 WL 362789, at *9 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a VRL.[13] Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic." 2026 WL 362789, at *10. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress.*" *Id.* (emphasis in original).

Nothing in Section 20701 restricts "all records and papers" to only those records and papers submitted by voters; even assuming that the examples of documents in the statute each "refers to something that the voter submits or does," *Benson*, 2026 WL 362789, at *9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from

---

[13] According to the data that the District of Columbia reported to the U.S. Election Assistance Commission, it is certain that a significant portion of the District of Columbia's registrations exist only in electronic form. Over 35,000 voter registration transactions, nearly 30% of all transactions, in the District of Columbia were reported as being done online. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited April 3, 2026). The District of Columbia deploys electronic Voter Registration Systems in all of its jurisdictions, so it is likely also that a large percentage of the remaining registrations are done electronically and not in paper form. *Id*. at 29-31.

a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. at 533); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Federal courts have rejected similar attempts to limit the scope of voting records. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a 'voter list' is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1329 (N.D. Ga. 2016) (rejecting defendant's argument

21

that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789, at \*10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and which "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to *Benson*, "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789, at \*9. That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). And the Board acquired the relevant records in the course of carrying out its duties as the entity responsible for administering elections in the District of Columbia.

*Benson*'s focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on

22

acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision – and then only "for a period of twenty-two months from the date" of that same election.

Contrary to *Benson*, then, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if *Benson's* distinction between self-generated records and papers and

23

those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under *Benson's* view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it.  52 U.S.C. § 20701. And the Board, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, this construction would create absurd results.  Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.)  The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA.  To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic VRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* 2d Neff Decl. ¶ 5.  Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible to carry out the duties assigned to him by Congress.

IV.    **THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS**

Defendants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of the District of Columbia's federal election records. *See* Dkt. 41-1 at 21–25; Dkt. 40-1 at 22–25; Dkt. 43-3 at 15–22.  Those arguments are misguided at best.  The

24

United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA, nor do the privacy laws of the District of Columbia. The requirement for a Privacy Impact Assessment under the E-Government Act does not apply to the investigation of the District of Columbia's list maintenance practices being conducted by the United States. Each of these arguments will be addressed briefly in turn.

### A. The United States is complying with the Privacy Act.

The Board argues that the United States must comply with the Privacy Act, and the United States is doing that. The Board suggests that the United States' demand violates the Privacy Act because it seeks records that are "a form of political expression protected by the First Amendment." Dkt. 41-1 at 21. The Board also argues that the United States has not "identifie[d] any SORN that would allow it to obtain the District's unredacted VRL." *Id*. at 22.

The demand by the United States expressly incorporates the Privacy Act.  *See* Dkt. 2-5 at 2. That said, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information.  In other words, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.[14]  The Complaint, incorporating the demand, is in full compliance.

The voter information that the United States is collecting is maintained according to the

---

[14] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act. *See* 306 F.2d at 230.

Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 Fed. Reg. 47610-01, 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy.[15] The United States made its requests and filed this case pursuant to those statutes. *See* Compl., Dkt. 5-1. The records in the system of records are kept under authority

---

[15] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited April 3, 2026). Similarly, the Brief of Former DOJ Employees, Dkt. 47-1 at 19–21, explains uses of Title III in Georgia in the vote denial context and in Alabama and Virginia in the NVRA context in which sensitive voter data has been used.

of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.  2d Neff Decl. ¶ 7.

**B. The First Amendment does not prohibit the United States' access to data maintained under HAVA or the NVRA.**

The Privacy Act does not prohibit the United States from obtaining the District of Columbia's VRL.  The Board contends that voter registration data the United States seeks is a form of political expression protected by the First Amendment and implicates a statutory bar to collecting such data.  *See* Dkt. 41-1 at 21.  But the Board misses the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment.  But that does not foreclose the United States from enforcing federal election laws like HAVA and the NVRA.  Enforcing HAVA and the NVRA are within the scope of an authorized law enforcement activity— necessarily implying that the United States can obtain the materials consistent with the Privacy Act. 5 U.S.C. § 552a(e)(7).  Moreover, Defendants' argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all.  That plainly is not what Congress intended.

**C. The E-Government Act does not prevent the United States from obtaining data maintained under HAVA or the NVRA.**

The Board next argues that the demand for production of the District of Columbia's VRL fails to comply with the E-Government Act.  *See* Dkt. 41-1 at 22–23.  The Board claims that the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating an investigation of its compliance with HAVA and the NVRA. *Id.* Again, neither the E-Government

27

Act nor interpretative case law support this assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The demand that was made to the Board was to provide an existing voter registration list already maintained pursuant to federal law. As noted above, the demand under the CRA is akin to an administrative subpoena, which is neither the posing of questions nor imposing reporting requirements. The VRL would be kept on a system for which a Privacy Impact Assessment has been done.[16] Only when a new system is established—not when a demand is made—is a Privacy Impact Assessment required.[17]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, HAVA, NVRA, or the

---

[16] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. *See* 2d Neff Decl. ¶ 6.

[17] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited April 3, 2026).

Uniform and Overseas Citizens Absentee Voting Act. Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

**D. The District of Columbia's Privacy Laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA.**

The Board asks the Court to legislate limitations conspicuously absent from Title III. The Board cites the District's local code to support the argument that only a redacted version of the District of Columbia's VRL is required. *See* Dkt. 41-1 at 23–25. But the Board fails to mention that the District's local code expressly disclaims this argument, providing that disclosure is appropriate where permitted by law. "[T]his section shall not operate to permit nondisclosure of information of which disclosure is authorized or mandated by other law." D.C. Code § 2-534(c).

HAVA and the NVRA are exactly the category of "other law" which the D.C. Code necessarily exempts, contrary to the Board's non-preemption arguments. *See* Dkt. 41-1 at 23–25. The United States needs to review the unredacted data to verify that the HAVA identifiers are being collected by the District of Columbia. *See* 52 U.S.C. § 21083(a)(5)(A).[18] The only way that the Attorney General can assess whether the District is actually collecting the driver's license and SSN4 information required by 52 U.S.C. § 21083(a)(5)(A) on the voter registration application is to examine those election records. That information is not provided in the redacted or public voter list.[19] "[I]t is well settled that the Elections Clause grants Congress 'the power to override state

---

[18] The United States understands that District of Columbia local law requires the District to collect the HAVA identifiers pursuant to D.C Code § 1-1001.07(a-1) (2026). That does not prevent the United States from verifying that the information actually is being collected by the District.

[19] If Defendants' position were to be adopted, it would eviscerate HAVA enforcement of 52 U.S.C. § 21083(a)(5)(A) and list maintenance in general. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA by having access to the voter identification numbers required by federal law. That information is necessary to identify duplicate

regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. at 384); *see also Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 7–9 & n.1 . Local laws that prevent jurisdictions from giving the United States their unredacted VRLs are in direct conflict with the NVRA and therefore "cease[] to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. at 384).

The text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that redact personal identifying information (PII). Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected this position by broad reference to "all records and papers." 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the

---

registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.

NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including the District of Columbia's VRL.  52 U.S.C. § 20701.  As *Lynd* made clear, "All means all." 306 F.2d at 230.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws.[20] The unredacted VRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[21]

The data the United States has requested under the CRA is the same that the District of Columbia admits it shares through the Electronic Registration Information Center, ("ERIC"), to facilitate compliance with federal list maintenance requirements. *See* Dkt. 41-1, at 25 & n.4.[22] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27,

---

[20] As the Second Neff declaration states, the Civil Rights Division's purpose for obtaining voter rolls is limited to assess compliance with HAVA and the NVRA. 2d Neff Decl. ¶¶ 2–5. To the extent that this Court is concerned that the United States might use the election records for immigration enforcement or purposes other than determining compliance with HAVA or the NVRA, this Court can craft an order prohibiting such use when ordering the District of Columbia to comply with the CRA demand.

[21] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* 2d Neff Decl. ¶ 19. As of April 3, 2026, seventeen states have provided their SVRL including: fourteen states that have provided their SVRLs without any MOU, two states that have agreed to provide their SVRL under the terms of the MOU, and one state pursuant to a settlement agreement. *Id*.

[22] *See* ERIC, "About ERIC," available at https://ericstates.org/about/ (last visited April 3, 2026). Twenty-five states also share their data with ERIC. *Id*.

2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed sub nom. Formella v. Coal. for Open Democracy*, No. 25-1585, 2025 WL 3786144, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of the District of Columbia's unredacted electronic VRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855–56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

## V.   CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss (Dkts. 40, 41 and 43) be denied, and that the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Dkt. 3-2) be granted.

Dated April 3, 2026,                    Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General

ERIC V. NEFF
Acting Chief, Voting Section

/s/ Joseph W. Voiland
Joseph W. Voiland
Jake T. Bachand
Civil Rights Division
Washington, D.C. 20002
(202) 353-5318
joseph.voiland@usdoj.gov
jake.bachand@usdoj.gov